**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: LEWIS DRUG, INC. DATA BREACH LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Master File No. 4:26-CV-4051-RAL<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

# CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Donna Senske, Jacquie Schneider, and Lori Reed (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons (the "Class" or "Class Members" (as further defined below)), allege the following against Defendant Lewis Drugs, Inc. and Defendant Lewis Family Drug, L.L.C. d/b/a Lewis Family Drug #64 (collectively referred to as, "Lewis" or "Defendant") based upon personal knowledge and according to information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiffs bring this class action against Lewis, upon information and belief, for its failure to properly secure and safeguard Plaintiffs' and other similarly situated individuals' personally identifiable information ("PII") and protected health information ("PHI"), resulting in an egregious data breach.[1]

2. Defendant is a neighborhood store and pharmacy with 61 locations in South

[1] *See, e.g.*, https://malware.news/t/ailock-ransomware-attack-on-lewis-drug/104584; https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/; https://www.hookphish.com/blog/ransomware-group-ailock-hits-lewis-drug/; https://www.breachsense.com/breaches/lewis-drug-data-breach/.

Dakota, Iowa, and Minnesota.[2]

3. Plaintiffs and Class Members are current and former customers and patients of Lewis.

4. In or around March 2026, online sources reported Lewis's systems were compromised by AiLock ransomware group, resulting in the access and exfiltration of highly sensitive PII and PHI (the "Data Breach" or "Breach").[3]

5. AiLock ransomware group claimed responsibility for the Data Breach on its dark web leak site and claimed it stole files containing highly sensitive information, as pictured below:[4]




6. Specifically, AiLock threatened, "[w]e have infiltrated the systems of Lewis Drug and extracted valuable data. If no contact is made, all data will be published."[5]

---

[2] https://www.lewisdrug.com/about.
[3] *Id.*
[4] *See* https://www.ransomlook.io/group/ailock; *see also* https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/ ("We have infiltrated the systems of Lewis Drug and extracted valuable data. If no contact is made, all data will be published.").
[5] https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/.

7. Thus, according to information and belief, the types of PII and PHI stolen in the Data Breach included current and former customers' and/or patients': (i) names; (ii) addresses; (iii) dates of birth; (iv) medical information (e.g., prescription information, diagnoses, medical record numbers, medical records, and/or treatment information); (v) financial information (e.g., credit/debit card numbers, pin numbers, and/or bank account information); (vi) medical insurance information; (vii) contact information; and/or (viii) Social Security numbers (collectively, "Private Information").

8. Lewis collected and maintained Plaintiffs' and Class Members' Private Information during the course of providing pharmaceutical services.

9. Despite multiple online sources reporting a breach of Defendant's systems,[6] Lewis has yet to publicly acknowledge the Data Breach or send individual notice of the Data Breach to the victims. Thus, most, if not all, Class Members do not know that their Private Information has been compromised, and that they are, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

10. Upon information and belief, the Private Information compromised in the Data Breach contained highly sensitive data, representing a gold mine for data thieves. As such, the risk of identity theft and fraud will remain for Plaintiffs' and Class Members' respective lifetimes.

11. Armed with the Private Information stolen in the Data Breach (and a significant head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class

---

[6] *See, e.g.*, https://malware.news/t/ailock-ransomware-attack-on-lewis-drug/104584; https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/; https://www.hookphish.com/blog/ransomware-group-ailock-hits-lewis-drug/; https://www.breachsense.com/breaches/lewis-drug-data-breach/.

Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12. To date, there has been no assurance offered by Lewis that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficiently to avoid a similar breach of its network in the future.

13. Therefore, Plaintiffs and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, and potential out-of-pocket expenses to remedy or mitigate the effects of the Data Breach.

14. Plaintiffs bring this class action lawsuit to address Lewis's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

15. Upon information and belief, the potential for improper disclosure and theft of Plaintiffs' and Class Members' Private Information was a known risk to Lewis, and thus Lewis was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack such as this.

16. Upon information and belief, Lewis failed to properly monitor and implement data security practices with regard to the computer network and systems that housed the Private Information. If Lewis had properly monitored its networks, it would have discovered the Breach sooner.

17. Plaintiffs' and Class Members' identities are now at risk because of Lewis's negligent conduct. The Private Information that Lewis collected and maintained is now in the hands of AiLock and other unauthorized third parties.

18. Plaintiffs seek to remedy these harms on behalf of themselves and on behalf of all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

## II. PARTIES

19. Plaintiff **Donna Senske** is, and at all times mentioned herein was, an individual citizen of Milan, Minnesota.

20. Plaintiff **Sheree Jeannette Heyduk** is, and at all times mentioned herein was, an individual citizen of Brookings, South Dakota.

21. Plaintiff **Jacquie Schneider** is, and at all times mentioned herein was, an individual citizen of Sioux Falls, South Dakota.

22. Plaintiff **Lori Reed** is, and at all times mentioned herein was, an individual citizen of Aberdeen, South Dakota.

23. Defendant **Lewis Drugs, Inc.** is a South Dakota corporation with its principal place of business located at 2701 S. Minnesota Ave. #1, Sioux Falls, South Dakota 57105. Defendant Lewis Drugs, Inc.'s Registered Agent is CT Corporation System, and it can be served at 319 S Coteau Street, Pierre, South Dakota 57501-3187.

24. Defendant **Lewis Family Drug, L.L.C. d/b/a Lewis Family Drug #64** is a South Dakota limited liability company with its principal place of business located at 2701 S Minnesota Ave. #1, Sioux Falls, South Dakota 57105. Defendant Lewis Family Drug, L.L.C. d/b/a Lewis

Family Drug #64's Registered Agent is CT Corporation System, and it can be served at 319 S Coteau Street, Pierre, South Dakota 57501-3187.

## III. JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants. Moreover, Defendants conduct pharmacy and medical retail businesses, maintain offices, and hire employees in South Dakota, Iowa, and Minnesota.

26. The Court has general personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on a business or business venture in this District; are registered with the Secretary of State of South Dakota; maintain their headquarters in South Dakota; have members and managers that reside in this District; and/or committed tortious acts in South Dakota.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which Defendants are headquartered and have the most significant contacts.

## IV. FACTUAL ALLEGATIONS

### A. *Lewis's Business and Collection of Plaintiffs' and Class Members' Private Information.*

28. Defendant is a pharmacy chain based in South Dakota with multiple locations throughout South Dakota, Minnesota, and Iowa.[7]

29. According to Defendant, "[s]ince 1942, Lewis has been a trusted family-owned neighborhood store and pharmacy with 61 convenient locations in South Dakota, Iowa, and

[7] https://www.lewisdrug.com/store-locator; https://www.lewisdrug.com/about.

Minnesota. Offering a wide selection of quality prescription and non-prescription drugs, along with everyday basics, name brands, and specialty items, all at affordable prices."[8]

30. As a pharmaceutical provider, Lewis knew or should have known of the importance of adequate data security.

31. As a condition of receiving pharmaceutical services, Lewis requires that its patients and customers entrust it with highly sensitive PII and PHI.

32. In the ordinary course of receiving pharmaceutical services from Lewis, Plaintiffs and Class Members were required to provide their Private Information to Defendant.

33. Upon information and belief, Lewis promises to keep patients' and customers' Private Information confidential and only disclose it for authorized purposes.

34. Due to the highly sensitive and personal nature of the Private Information Lewis acquires and stores with respect to its patients and customers, Lewis, upon information and belief, promises to, among other things: (i) keep Private Information private; (ii) comply with industry standards related to data security and the maintenance of Private Information; (iii) inform Plaintiffs and Class Members of its legal duties relating to data security and comply with all federal and state laws protecting Private Information; (iv) only use and release Private Information for reasons that relate to the pharmaceutical services it provides; and (v) provide adequate notice to Plaintiffs and Class Members if their Private Information is disclosed without authorization.

35. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Lewis assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized access and exfiltration.

---

[8] https://www.lewisdrug.com/about.

36. Plaintiffs and Class Members relied on Lewis to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B. *The Data Breach and Defendant's Inadequate Notice to Plaintiffs and Class Members.***

37. Upon information and belief, and according to online sources, Lewis was reportedly compromised by AiLock ransomware group, resulting in a devastating data breach in or around March 2026.[9]

38. After the Data Breach, AiLock claimed responsibility for the Data Breach on its dark web leak site on or around March 3, 2026, and threatened that "[w]e have infiltrated the systems of Lewis Drug and extracted valuable data. If no contact is made, all data will be published."[10]

39. "Operating as a Ransomware-as-a-Service (RaaS), AiLock allows cybercriminal affiliates to 'rent' the malware, target organizations, and extort money in exchange for access to their own data."[11]

40. "Traditionally, ransomware gang playbooks are simple: steal data, encrypt it, and threaten to leak if you don't pay. AiLock follows this template—but adds a vicious new layer:

- **Threatening to Notify Regulators:** The ransom note (helpfully dropped as a ReadMe.txt in every affected directory) warns that if you don't comply, your country's personal data regulators will be tipped off about the breach.

---

[9] *See, e.g.*, https://malware.news/t/ailock-ransomware-attack-on-lewis-drug/104584; https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/; https://www.hookphish.com/blog/ransomware-group-ailock-hits-lewis-drug/; https://www.breachsense.com/breaches/lewis-drug-data-breach/.

[10] https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/.

[11] https://innovirtuoso.com/ransomware/ailock-ransomware-explained-everything-you-need-to-know-to-stay-safe-in-2025/#google_vignette.

- **Alerting Competitors:** As if regulatory trouble wasn't enough, AiLock threatens to email and post about your breach to your business rivals—potentially causing irreparable damage to your reputation and competitive standing."[12]

41. Despite multiple online sources reporting that Defendant suffered a data breach,[13] Defendant has yet to publicly acknowledge the Data Breach or send individual notice of the Data Breach to the victims.

42. Upon information and belief, Lewis had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

43. Plaintiffs and Class Members provided their Private Information to Lewis with the reasonable expectation and mutual understanding that Lewis would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

44. Lewis's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

45. Lewis knew or should have known that its electronic records would be targeted by cybercriminals.

**C. *The Healthcare Sector is Particularly Susceptible to Data Breaches.***

46. Lewis was on notice that entities within the healthcare industry have long been a

---

[12] *Id.*

[13] *See, e.g.*, https://malware.news/t/ailock-ransomware-attack-on-lewis-drug/104584; https://www.dexpose.io/ailock-ransomware-attack-on-lewis-drug/; https://www.hookphish.com/blog/ransomware-group-ailock-hits-lewis-drug/; https://www.breachsense.com/breaches/lewis-drug-data-breach/.

routine target for data breaches.

47. Indeed, pharmacies routinely experience data breaches, making prevention even more prevalent and important.[14]

48. In August 2014, after a cyberattack on Community Health Systems, Inc., the Federal Bureau of Investigation ("FBI") warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[15]

49. The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[16]

50. In 2022, the largest growth in compromises occurred in the healthcare sector.[17]

51. "The healthcare sector is a top target of threat actors because of the volume and sensitivity of patient data it handles, ranging from medical history to personally identifiable

---

[14] *See e.g.*, https://www.hipaajournal.com/almost-6-million-individuals-affected-by-pharmerica-data-breach/ (reporting 5,815,591 individuals were impacted in the PharMerica data breach in March 2023); https://www.hipaajournal.com/vectrarx-mail-pharmacy-services-notifies-data-breach/ (reporting 109,383 individuals were impacted by VectraRx Mail Pharmacy Services' data breach in 2025); https://www.hipaajournal.com/data-breach-morton-drug-company-physicians-to-children-adolescents/ (reporting 40,051 individuals were impacted in Morton Drug Company's 2025 data breach).

[15] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug. 2014), *available at* https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[16] Identity Theft Resource Center, *2018 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2019/01/ITRC_2018-EOY-BREACH-REPORT-KEY-FINDINGS.pdf.

[17] Identity Theft Resource Center, *2022 End-of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf .

information (PII) and financial records. In the first few months of 2025, healthcare organizations faced an average of 2309 attacks per week, marking a 39% increase compared to last year."[18]

52. When compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[19]

53. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[20]

54. As a pharmaceutical provider in the healthcare industry, Lewis knew, or should have known, the importance of safeguarding its patients' Private Information, including PHI, entrusted to it, and of the foreseeable consequences if such data were to be disclosed. These consequences include the significant costs that would be imposed on Lewis's patients as a result of a breach. Lewis failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[18] https://wire.com/en/blog/the-impact-of-data-breaches-on-industries.

[19] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ .

[20] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

**D. *Lewis Failed to Comply with HIPAA.***

55. Title II of HIPAA contains what are known as the Administrative Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that HHS create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

56. Upon information and belief, Lewis's Data Breach resulted from a combination of insufficiencies that indicate Lewis failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Lewis's Data Breach that Lewis either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

57. Upon information and belief, Plaintiffs' and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by C.F.R. § 160.103.

58. 45 C.F.R. § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

59. 45 C.F.R. § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

60. Upon information and belief, Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 C.F.R. § 164.402.

61. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, as a result of the Data Breach.

62. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI has been acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, as a result of the Data Breach.

63. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

64. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

65. Upon information and belief, Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach.

66. It is reasonable to infer that Plaintiffs' and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

67. It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, and which was not rendered

unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

68. Given the occurrence of the Data Breach and impact such has had on victims' Private Information, it is reasonable for these victims, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

69. Upon information and belief, the Data Breach could have been prevented if Lewis had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its patients.

70. Upon information and belief, Lewis's security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Lewis creates, receives, maintains, and transmits in violation of 45 C.F.R. 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 C.F.R. 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. 164.502, *et seq.*

71. While monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure Lewis's approach to information security is adequate and appropriate going forward. Upon information and belief, Lewis still maintains the PHI and other highly sensitive PII of its current and former patients, including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

### E. *Lewis Failed to Comply with FTC Guidelines.*

72. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

73. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[21] . The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

74. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

75. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and

[21] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

76. Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Lewis here. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

77. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Lewis of failing to use reasonable measures to protect Private Information they collect and maintain from consumers. The FTC publications and orders described above also form part of the basis of Lewis's duty in this regard.

78. The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[22]

79. As evidenced by the Data Breach, Lewis failed to properly implement basic data security practices. Lewis's failure to employ reasonable and appropriate measures to protect

---

[22] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

80. Lewis was at all times fully aware of its obligation to protect the Private Information of its patients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F. *Lewis Failed to Comply with Industry Standards.***

81. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

82. The Center for Internet Security's ("CIS") Critical Security Controls ("CSC") recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[23]

83. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and

[23] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list.

other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

84. Further, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to

respond if an intrusion occurs," and other steps.[24]

85. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

### G. *Lewis Breached its Duty to Safeguard Plaintiffs' and Class Members' Private Information.*

86. In addition to its obligations under federal and state laws, Lewis owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Lewis owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

87. Upon information and belief, Lewis breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and

[24] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations.

safeguard its computer systems and data. Lewis's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to sufficiently train its employees regarding the proper handling of its patients' Private Information;

e. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

f. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and/or

g. Otherwise breaching its duties and obligations to protect Plaintiffs' and Class Members' Private Information.

88. Upon information and belief, Lewis negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

89. Upon information and belief, had Lewis remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

90. Accordingly, Plaintiffs' and Class Members' lives were severely disrupted. What's

more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiffs and Class Members also lost the benefit of the bargain they made with Lewis.

**H. *Plaintiffs and Class Members are at a Significantly Increased and Substantial Risk of Fraud and Identity Theft as a Result of the Data Breach.***

91. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiffs and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[25] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

92. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

93. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a

---

[25] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf.

data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

94. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

95. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members.

96. One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

97. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

98. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed

Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

99. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[26] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

100. Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even

[26] *See IdentityTheft.gov,* Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps.

give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

101. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[27] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77-percent experienced financial-related problems;
- 29-percent experienced financial losses exceeding $10,000;
- 40-percent were unable to pay bills;
- 28-percent were turned down for credit or loans;
- 37-percent became indebted;
- 87-percent experienced feelings of anxiety;
- 67-percent experienced difficulty sleeping; and
- 51-percent suffered from panic of anxiety attacks.[28]

102. PHI is also especially valuable to identity thieves. As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[29]

103. Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

---

[27] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf .
[28] *Id.* at pp. 21–25.
[29] Federal Trade Commission, *Warning Signs of Identity Theft, available at*: https://consumer.ftc.gov/articles/what-know-about-identity-theft.

104. While credit card information and associated PII can sell for as little as $1-$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[30]

105. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

106. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[31]

107. The ramifications of Lewis's failure to keep its patients' Private Information secure are long-lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

108. Upon information and belief, here, not only was sensitive medical information compromised, but financial information and Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is

---

[30] *Data Breaches: In the Healthcare Sector,* CENTER FOR INTERNET SECURITY, *available at*: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector.

[31] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," KAISER HEALTH NEWS (Feb. 7, 2014), *available at*: https://kffhealthnews.org/news/rise-of-indentity-theft/.

astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

109. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[32]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

110. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

111. As a result, Plaintiffs and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiffs and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**I. *Plaintiffs' and Class Members' Damages.***

***Plaintiff Senske's Experience***

112. Plaintiff Senske is a current customer of Defendant. As such, Plaintiff Senske provided her Private Information to Defendant to receive services. Specifically, Plaintiff Senske

---

[32] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf.

provided Lewis Drugs with her full name, date of birth, phone number, email address, Social Security number, state identification/driver's license number, and government identification number, as well as other information required on Lewis Drugs' forms.

113. Upon information and belief, Plaintiff Senske is a victim of the Data Breach. Plaintiff Senske discovered the Data Breach through her own research. Specifically, Plaintiff Senske independently became aware of the incident while conducting her own online research, prompted by a marked increase in spam notifications, which is a recognized indicator of unauthorized access to personal information commonly associated with data breaches.

114. As a result of the Data Breach, Plaintiff Senske will now experience a lifetime of increased risk of identity theft and other forms of targeted fraudulent misuse of her Private Information.

115. Plaintiff Senske suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and monitoring her accounts for fraud.

116. Plaintiff Senske would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate data security to safeguard her Private Information from theft.

117. Plaintiff Senske suffered actual injury in the form of having her Private Information stolen as a result of the Data Breach.

118. Upon information and belief, Plaintiff Senske's Private Information is now publicly available on the dark web because that is the *modus operandi* of cybercriminals who perpetrate data breaches of this nature, particularly AiLock ransomware group, who has already claimed responsibility for the Data Breach.

119. Plaintiff Senske suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Senske entrusted to Defendant and which was compromised in, and as a result of, the Data Breach.

120. Plaintiff Senske suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

121. Following and as a result of the Data Breach, Plaintiff Senske experienced a marked increase in spam using the same contact information and data she provided to Defendant and that was compromised in the Data Breach.

122. Plaintiff Senske has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, because Defendant's systems have already been shown to be highly susceptible to compromise and are subject to further attacks so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect Private Information.

123. As a result of the Data Breach, Plaintiff Senske made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: (i) researching the Data Breach; (ii) reviewing financial accounts for any indications of actual or attempted identity theft or fraud; (iii) researching the Data Breach; and/or (iv) researching the credit monitoring services offered by Defendant. Plaintiff Senske estimates she spends an hour per week dealing with the Data Breach, valuable time she otherwise would have spent on other activities (such as employment or recreation).

124. As a result of the Data Breach, Plaintiff Senske has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Senske is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

125. Plaintiff Senske also suffered actual injury as a result of the Data Breach in the form of: (i) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff Senske; (ii) violation of her privacy rights; and (iii) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

126. As a result of the Data Breach, Plaintiff Senske anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

127. In sum, Plaintiff Senske and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

***Plaintiff Heyduk's Experience***

128. Plaintiff Heyduk is a former employee of Defendant. As such, Plaintiff Heyduk provided her Private Information to Defendant in exchange for employment.

129. Plaintiff Heyduk suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

130. Plaintiff Heyduk would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate data security to safeguard her Private Information from theft.

131. Plaintiff Heyduk suffered actual injury in the form of having her Private Information stolen as a result of the Data Breach.

132. Upon information and belief, Plaintiff Heyduk's Private Information is now publicly available on the dark web because that is the *modus operandi* of cybercriminals who perpetrate data breaches of this nature, particularly AiLock ransomware group, who has already claimed responsibility for the Data Breach.

133. Plaintiff Heyduk suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff Heyduk entrusted to Defendant and which was compromised in, and as a result of, the Data Breach.

134. Plaintiff Heyduk suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

135. After the Data Breach, Plaintiff Heyduk suffered actual misuse of her Private Information. Specifically, excessive incoming spam notifications to her cell phone. Plaintiff Heyduk reasonably believes this instance of actual misuse is related to the Data Breach because her contact information was one of the categories of data that was impacted during the data security incident.

136. Plaintiff Heyduk has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, because Defendant's systems have already been shown to be

highly susceptible to compromise and are subject to further attacks so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect Private Information

137. As a result of the Data Breach, Plaintiff Heyduk made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: (i) researching the Data Breach; (ii) reviewing financial accounts for any indications of actual or attempted identity theft or fraud; (iii) researching the Data Breach; and/or (iv) researching the credit monitoring services offered by Defendant. Plaintiff Heyduk estimates she has spent approximately 15 hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

138. As a result of the Data Breach, Plaintiff Heyduk has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against her. Plaintiff Heyduk is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

139. Plaintiff Heyduk also suffered actual injury as a result of the Data Breach in the form of: (i) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff Heyduk; (ii) violation of her privacy rights; and (iii) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

140. As a result of the Data Breach, Plaintiff Heyduk anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

141. In sum, Plaintiff Heyduk and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

***Plaintiff Schneider's Experience***

142. Plaintiff Schneider is a former employee of Defendant.

143. As a condition of obtaining employment services, Plaintiff Schneider was required to provide Defendant with her Private Information.

144. Defendant was in possession of Plaintiff Schneider's Private Information before, during, and after the Data Breach.

145. Plaintiff Schneider reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Schneider would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

146. Plaintiff Schneider greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Schneider is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

147. Plaintiff Schneider stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private

Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

148. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

149. As a result of the Data Breach, Plaintiff Schneider has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Schneider would have spent on other activities, including but not limited to work and/or recreation.

150. As a consequence of and following the Data Breach, Plaintiff Schneider has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information.

151. The Data Breach has caused Plaintiff Schneider to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her Private Information was acquired by criminals as a result of the Data Breach.

152. Plaintiff Schneider anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Schneider will continue to be at present and continued increased risk of identity theft and fraud for years to come.

153. Plaintiff Schneider has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

154. As a direct and traceable result of the Data Breach, Plaintiff Schneider suffered actual injury and damages after her Private Information was compromised and stolen in the Data

Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Schneider and (g) other economic and non-economic harm.

***Plaintiff Reed's Experience***

155. Plaintiff Reed is a customer of Defendant.

156. As a condition of obtaining services, Plaintiff Reed was required to provide Defendant with her Private Information.

157. Defendant was in possession of Plaintiff Reed's Private Information before, during, and after the Data Breach.

158. Plaintiff Reed reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Reed would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

159. Plaintiff Reed greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Reed is very

concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

160. Plaintiff Reed stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and credit card accounts.

161. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

162. As a result of the Data Breach, Plaintiff Reed has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords and other necessary mitigation efforts. This is valuable time that Plaintiff Reed would have spent on other activities, including but not limited to work and/or recreation.

163. As a consequence of and following the Data Breach, Plaintiff Reed has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of her Private Information.

164. The Data Breach has caused Plaintiff Reed to suffer fear, anxiety, and stress, which has been compounded by Defendant's delay in noticing her of the fact that her Social Security number was acquired by criminals as a result of the Data Breach.

165. Plaintiff Reed anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Reed will continue to be at present and continued increased risk of identity theft and fraud for years to come.

166. Plaintiff Reed has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

167. As a direct and traceable result of the Data Breach, Plaintiff Reed suffered actual injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her first and last name paired with her Social Security number and other sensitive information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Reed and (g) other economic and non-economic harm.

***Classwide Injuries***

168. Upon information and belief, Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

169. Plaintiffs and Class Members entrusted their Private Information to Defendant in order to receive Defendant's pharmaceutical services.

170. Upon information and belief, Plaintiffs' and Class Members' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

171. As a direct and proximate result of Lewis's actions and omissions, Plaintiffs and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

172. Plaintiffs and Class Members may incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

173. Plaintiffs and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiffs and Class Members.

174. The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiffs and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiffs and Class Members.

175. Plaintiffs and Class Members also lost the benefit of the bargain they made with Lewis. Plaintiffs and Class Members overpaid for pharmaceutical services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiffs and Class Members paid to Lewis was intended to be used by Lewis to fund adequate security of Lewis's system and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class did not receive the benefit of the bargain.

176. Upon information and belief, Plaintiffs and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach.

177. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[33] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[34]

178. As a result of the Data Breach, Plaintiff's, and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its reported acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiffs and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiffs and the Class Members, thereby causing additional loss of value.

179. Finally, Plaintiffs and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

180. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Lewis, is protected from

---

[33] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD, https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/.

[34] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of its patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

181. As a direct and proximate result of Lewis's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V. CLASS ACTION ALLEGATIONS

182. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

183. Specifically, Plaintiffs propose the following Class, subject to amendment as appropriate:

> **Class**
>
> All individuals whose Private Information was compromised as a result of the Data Breach.

184. Excluded from the Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

185. Plaintiffs reserve the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

186. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23

187. <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time,

based on information and belief, the Class consists of thousands of current and former patients of Lewis whose data was compromised in the Data Breach. The identities of Class Members are ascertainable through Lewis's records, Class Members' records, publication notice, self-identification, and other means.

188. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Lewis engaged in the conduct alleged herein;

b. Whether Lewis's conduct violated the FTCA and HIPAA;

c. When Lewis learned of the Data Breach;

d. Whether Lewis's response to the Data Breach was adequate;

e. Whether Lewis unlawfully lost or disclosed Plaintiffs' and Class Members' Private Information;

f. Whether Lewis failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether Lewis's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether Lewis's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether Lewis owed a duty to Class Members to safeguard their Private Information;

j. Whether Lewis breached its duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether Lewis had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and the Class Members;

m. Whether Lewis breached its duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class Members;

n. Whether Lewis knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiffs and Class Members suffered as a result of Lewis's misconduct;

p. Whether Lewis's conduct was negligent;

q. Whether Lewis's conduct was *per se* negligent;

r. Whether Lewis was unjustly enriched;

s. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiffs and Class Members are entitled to credit or identity monitoring and monetary relief; and

u. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

189. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Lewis. Plaintiffs are advancing the same claims and legal theories on behalf of themselves, and all other Class Members, and there are no defenses that are unique to any Plaintiff. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

190. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

191. Predominance. Lewis has engaged in a common course of conduct toward Plaintiffs and Class Members in that all of Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Lewis's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

192. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Lewis. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

193. Lewis has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

194. Finally, all members of the proposed Class are readily ascertainable. Lewis has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## VI. CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFFS AND THE CLASS)

195. Plaintiffs restate and reallege paragraphs 1-194 as if fully set forth herein.

196. Lewis knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Private Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

197. Lewis's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

198. Lewis knew or should have known of the risks inherent in collecting the Private Information of Plaintiffs and Class Members and the importance of adequate security. Lewis was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

199. Lewis owed a duty of care to Plaintiffs and Class Members whose Private Information was entrusted to it. Lewis's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class Members pursuant to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiffs and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

200. Lewis's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

201. Lewis's duty also arose because Defendant was bound by industry standards to protect its patients' confidential Private Information.

202. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Lewis owed them a duty of care to not subject them to an unreasonable risk of harm.

203. Upon information and belief, Lewis, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Lewis's possession.

204. Upon information and belief, Lewis, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiffs and Class Members.

205. Upon information and belief, Lewis, by its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

206. Upon information and belief, Lewis breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

207. Upon information and belief, Lewis acted with reckless disregard for the rights of Plaintiffs and Class Members by failing to provide prompt individual notice of the Data Breach such that Plaintiffs and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

208. Lewis had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Lewis with their Private Information was predicated on the understanding that Lewis would take adequate security precautions. Moreover, only Lewis had the ability to protect its systems (and the Private Information that it stored on them) from attack.

209. Lewis's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised, exfiltrated, and misused, as alleged herein.

210. Lewis's breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their Private Information.

211. As a result of Lewis's negligence in breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their Private

Information, which upon information and belief, is still in the possession of third parties, will be used for fraudulent purposes.

212. Lewis also had independent duties under state laws that required it to reasonably safeguard Plaintiffs' and Class Members' Private Information and promptly notify them about the Data Breach.

213. As a direct and proximate result of Lewis's negligent conduct, Plaintiffs and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

214. The injury and harm that Plaintiffs and Class Members suffered was reasonably foreseeable.

215. Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

216. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Lewis to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

217. Plaintiffs restate and reallege paragraphs 1-194 as if fully set forth herein.

218. Pursuant to Section 5 of the FTCA, Lewis had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and Class Members.

219. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Lewis had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

220. Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

221. Upon information and belief, Lewis breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

222. Specifically, Lewis breached its duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

223. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Lewis's duty in this regard.

224. Upon information and belief, Lewis also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

225. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiffs' and

Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Lewis's networks, databases, and computers that stored Plaintiffs' and Class Members' unencrypted Private Information.

226. Plaintiffs and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Lewis's failure to comply with both constitutes negligence *per se*.

227. Upon information and belief, Plaintiffs' and Class Members' Private Information constitutes personal property that was stolen due to Lewis's negligence, resulting in harm, injury, and damages to Plaintiffs and Class Members.

228. As a direct and proximate result of Lewis's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual misuse of their Private Information and effort to mitigate the actual and potential impact of the Data Breach on their lives.

229. Upon information and belief, as a direct and proximate result of Lewis's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

230. In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Lewis to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

231. Plaintiffs restate and reallege paragraphs 1-194 as if fully set forth herein.

232. Lewis provides pharmaceutical services to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

233. Through Defendant's sale of services to Plaintiffs and Class Members, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

234. As consideration, Plaintiffs and Class Members paid money to Lewis and/or turned over valuable Private Information to Lewis. Accordingly, Plaintiffs and Class Members bargained with Lewis to securely maintain and store their Private Information.

235. Lewis accepted payment and/or possession of Plaintiffs' and Class Members' Private Information for the purpose of providing services to Plaintiffs and Class Members.

236. In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's services, Plaintiffs and Class Members intended and understood that Lewis would adequately safeguard the Private Information as part of those services.

237. Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to: (i) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (ii) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (iii) restricting access to qualified and trained employees and/or agents; (iv) designing

and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (v) applying or requiring proper encryption; (vi) implementing multifactor authentication for access; (vii) complying with HIPAA standards to make sure that Plaintiffs' and Class Members' PHI would remain protected; and (viii) taking other steps to protect against foreseeable data breaches.

238. Plaintiffs and Class Members would not have entrusted their Private Information to Lewis in the absence of such an implied contract.

239. Had Lewis disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to Lewis.

240. As a provider of healthcare, Lewis recognized (or should have recognized) that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class Members.

241. Upon information and belief, Lewis violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information. Lewis further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

242. Additionally, Lewis breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted, in violation of 45 C.F.R. 164.306(a)(1).

243. Lewis also breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. 164.312(a)(1).

244. Lewis further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. 164.308(a)(1).

245. Lewis further breached the implied contracts with Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. 164.308(a)(6)(ii).

246. Lewis further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. 164.306(a)(2).

247. Lewis further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. 164.306(a)(3).

248. Lewis further breached the implied contracts with Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 C.F.R. 164.306(a)(94).

249. Lewis further breached the implied contracts with Plaintiffs and Class Members by impermissibly and improperly using and disclosing protected health information that is and

remains accessible to unauthorized persons, in violation of 45 C.F.R. 164.502, *et seq*.

250. Lewis further breached the implied contracts with Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 C.F.R. 164.530(c).

251. Upon information and belief, Lewis further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

252. A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to Lewis in exchange for Lewis's agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

253. Upon information and belief, Plaintiffs and Class Members have been damaged by Lewis's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

254. Plaintiffs restate and reallege paragraphs 1-194 as if fully set forth herein.

255. This Count is pleaded in the alternative to Count III above.

256. Plaintiffs and Class Members conferred a benefit on Lewis by turning over their Private Information to Defendant and by paying for products and services that should have included cybersecurity protection to protect their Private Information. Plaintiffs and Class Members did not receive such protection.

257. Upon information and belief, Lewis funds its data security measures entirely from its general revenue, including from payments made to it by Plaintiffs and Class Members.

258. As such, a portion of the payments made by Plaintiffs and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Lewis.

259. Lewis has retained the benefits of its unlawful conduct, including the amounts of payment received from Plaintiffs and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

260. Upon information and belief, Lewis knew that Plaintiffs and Class Members conferred a benefit upon it, which Lewis accepted. Lewis profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

261. If Plaintiffs and Class Members had known that Lewis had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

262. Due to Lewis's conduct alleged herein, it would be unjust and inequitable under the circumstances for Lewis to be permitted to retain the benefit of its wrongful conduct.

263. Upon information and belief, as a direct and proximate result of Lewis's conduct, Plaintiffs and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication,

and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Lewis's possession and is subject to further unauthorized disclosures so long as Lewis fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

264. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Lewis and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Lewis from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

265. Plaintiffs and Class Members may not have an adequate remedy at law against Lewis, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(ON BEHALF OF PLAINTIFFS AND THE CLASS)**

266. Plaintiffs restate and reallege paragraphs 1-194 as if fully set forth herein.

267. In light of the special relationship between Lewis and its patients, whereby Lewis became a guardian of Plaintiffs' and Class Members' Private Information (including highly sensitive, confidential, personal, and other PHI) Lewis was a fiduciary, created by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiffs and Class Members. This benefit included (i) the safeguarding of Plaintiffs' and Class Members' Private Information; (ii) timely notifying Plaintiffs and Class Members of the Data Breach; and (iii) maintaining complete and accurate records of what and where Lewis's patients' Private Information was and is stored.

268. Lewis had a fiduciary duty to act for the benefit of Plaintiffs and the Class upon matters within the scope of its patients' relationship, in particular to keep the Private Information secure.

269. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and the Class by failing to protect their Private Information.

270. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic PHI Lewis created, received, maintained, and transmitted, in violation of 45 C.F.R. 164.306(a)(1).

271. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. 164.312(a)(1).

272. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. 164.308(a)(1).

273. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. 164.308(a)(6)(ii).

274. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. 164.306(a)(2).

275. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. 164.306(a)(3).

276. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce, in violation of 45 C.F.R. 164.306(a)(94).

277. Upon information and belief, Lewis breached its fiduciary duties to Plaintiffs and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. 164.502, *et seq.*

278. As a direct and proximate result of Lewis's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

## COUNT VI
## DECLARATORY JUDGMENT
## (ON BEHALF OF PLAINTIFFS AND THE CLASS)

279. Plaintiffs restate and reallege paragraphs 1-194 as if fully set forth herein.

280. This Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the laws and regulations described in this Petition.

281. Lewis owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

282. Lewis still possesses Private Information regarding Plaintiffs and Class Members.

283. Plaintiffs allege that Lewis's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information, and the risk remains that further compromises of their Private Information will occur in the future.

284. This Court should enter a judgment declaring, among other things, the following:

a. Lewis owes a legal duty to secure its patients' Private Information and to timely notify customers of a data breach under the common law, HIPAA, and the FTCA;

b. Lewis's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect patients' Private Information; and

c. Lewis continues to breach this legal duty by failing to employ reasonable measures to secure patients' Private Information.

285. This Court should also issue corresponding prospective injunctive relief requiring Lewis to employ adequate security protocols consistent with legal and industry standards to protect patients' Private Information, including the following:

a. Order Lewis to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, Lewis must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Lewis's systems on a periodic basis, and ordering Lewis to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training its security personnel regarding any new or modified procedures;

iv. segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Lewis's systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating its patients about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

286. If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Lewis. The risk of another such breach is real, immediate, and substantial. If another breach at Lewis occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

287. The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Lewis if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Lewis's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Lewis has a pre-existing legal obligation to employ such measures.

288. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Lewis, thus preventing future injury to Plaintiffs and other patients whose Private Information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above, seek the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. Judgment in favor of Plaintiffs and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Lewis to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

e. An order requiring Lewis to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

Dated: June 29, 2026 Respectfully submitted,

/s/ Brett Waltner
Brett Waltner
**MYERS BILLION, LLP**
230 S. Phillips Ave. Ste. 300
Sioux Falls, SD 57104
Tel: (605) 336-3700
bwaltner@myersbillion.com

Jonathan P. McCoy
**COSTELLO, PORTER, HILL, HESITERKAMP, BUSHNELL & CARPENTER, LLP**

P.O. Box 290
Rapid City, SD 57709-0290
Tel: (605) 343-2410
jmccoy@costelloporter.com

Tyler J. Bean
(*pro hac vice* application forthcoming)
Kennedy M. Brian
(*pro hac vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: kbrian@sirillp.com

Bryan L. Bleichner
(*pro hac vice* application forthcoming)
Philip J. Krzeski
(*pro hac vice* application forthcoming)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave S, Suite 1700
Minneapolis, Minnesota 55401
Tel: (612) 339-7300
E: bbleichner@chestnutcambronne.com
E: pkrzeski@chestnutcambronne.com

Gary M. Klinger
*Pro Hac Vice*
**MILBERG, PLLC**
227 W Monroe St, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

Gary E. Mason
(*pro hac vice* application forthcoming)
Danielle L. Perry
(*pro hac vice* application forthcoming)
**MASON & PERRY LLP**
5335 Wisconsin Avenue NW, Ste. 640
Washington, DC 20015
Tel: (202) 429-2290
Email: gmason@masonllp.com
Email: dperry@masonllp.com